## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **NORMAN Y. MINETA, Secretary, United** | ) | |
| **States Department of Transportation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-CV-0297-CVE-PJC** |
| | ) | |
| **BOARD OF COUNTY COMMISSIONERS** | ) | |
| **of the COUNTY OF DELAWARE;** | ) | |
| **COUNTY, MONKEY ISLAND** | ) | |
| **DEVELOPMENT AUTHORITY; MID-** | ) | |
| **AMERICA AG NETWORK, INC., a** | ) | |
| **Kansas corporation; PAUL STATEN;** | ) | |
| **ISLAND ENTERPRISES, INC., an** | ) | |
| **Oklahoma Corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court is the Motion to Dismiss by Defendants Paul Staten and Island

Enterprises[, Inc.] and Memorandum of Points and Authorities in Support Thereof (Dkt. # 20) and

Plaintiff Mineta's Motion for Summary Judgment against Defendant Board of County

Commissioners of the County of Delaware and Defendant Monkey Island Development Authority

(Dkt. # 41).

## I.

The federal government, through the Federal Aviation Administration ("FAA"), has been

given authority by Congress to provide airport improvement grants to state and local governments.

See 49 U.S.C. § 47101 et seq. Congress established the Airport and Airway Trust Fund from which

the Secretary of Transportation may make project grants "[t]o maintain a safe and efficient

nationwide system of public-use airports that meets the present and future needs of civil

aeronautics."  49 U.S.C. § 47104(a).  Monkey Island Development Authority ("MIDA") is a public

trust established under Okla. Stat. tit 60, § 176.  MIDA's beneficiary is Delaware County ("the

County").  In 1994, MIDA applied for a grant from the FAA to acquire land for the Grand Lake

Regional Airport ("the Airport").[1]  The FAA approved MIDA's request for a grant, but required the

County to sign the grant agreement as a sponsor before any funds would be disbursed.  The County

approved the transaction and agreed to act as a sponsor.[2]   In the grant agreement, both MIDA and

the County are listed as sponsors.

The grant agreement contained assurances and promises by the FAA and both sponsors

conditioning the use and expenditure of grant funds.  The FAA agreed to provide a maximum of

$630,000 for MIDA and the County to acquire land for the Airport.  In exchange, the sponsors

agreed to abide by certain conditions imposed by the federal government for receipt of federal

funding.  In September 2002, MIDA applied for another grant to build a fence around the perimeter

---

[1]     MIDA stated the objective for the project was to "acquire land which was previously
occupied by a privately-owned airport (which is currently closed) so that the airport can be
operated as a public use facility."  Dkt. # 41, Ex. B, Grant Agreement, at 8.  The airport was
originally called the Shangri-La Airport, but its name was subsequently changed to the
Grand Lake Regional Airport.

[2]     In order to authorize the County to act as a sponsor, the Board of County Commissioners of
Delaware County ("the Board")  had to adopt a resolution.  In this resolution, the Board
agreed that the County should act as a sponsor and accept federal funds for the proposed
airport, and in exchange, specifically stated that the County would be bound by all
assurances in the grant agreement.  The resolution stated that the "FAA has required that the
County expressly approve, adopt and agree to abide by and perform all of the Part V
Assurances together with any and all other requirements under the Grant Agreement, all of
which the County is desirous of doing."  Dkt. # 47, Ex. A, Resolution, at 1.

of the Airport.  Upon approval of the 2002 grant agreement by the County,[3] the FAA issued a grant

to MIDA and the County for $167,625 to construct the proposed fence.[4]  The grant agreement

contained the same assurances and conditions as the 1994 agreement.

Both the 1994 and 2002 grant agreements (collectively "the grant agreements") contained

the same assurances by the FAA and the sponsors.  The grant agreements restricted alienability of

any property the sponsors intended to purchase with the funding:

> [The sponsor] will not sell, lease, encumber, or otherwise transfer or dispose of any
> part of its title or other interests in the property shown on Exhibit A to this
> application or, for a noise compatibility program project, that portion of the property
> upon which Federal funds have been expended, for the duration of the terms,
> conditions, and assurances in the grant agreement without approval by the Secretary.
> If the transferee is found by the Secretary to be eligible under the Airport and Airway
> Improvement Act of 1982 to assume the obligations of the grant agreement and to
> have the power, authority, and financial resources to carry out all such obligations,
> the sponsor shall insert in the contract or document transferring or disposing of the
> sponsor's interest, and make binding upon the transferee all of the terms, conditions,
> and assurances contained in this grant agreement.

Dkt. # 41, Ex. B, Grant Agreement, at 17; Id., Ex. C., Grant Agreement at 21.  The grant agreements

provide that "there shall be no limit on the duration of the assurance against exclusive rights or the

terms, conditions and assurances with respect to real property acquired with Federal funds."  Id.  If

the land was no longer used for airport purposes, the grant agreements imposed the following

condition on the sponsors:

---

[3]     The Board adopted a resolution for the County to serve as a sponsor for the 2002 grant.
        Although different in form from its resolution in 1994, it states that the County "agrees to
        comply with all the terms and conditions of said Offer and in the Project Application."  Dkt.
        # 41, Ex. C, Grant Agreement, at 29.

[4]     Paul Staten ("Staten") and Island Enterprises, Inc. ("Island Enterprises") have suggested that
        MIDA did not spend the grant funds to build a perimeter fence.  However, there is no
        evidence in the summary judgment record to support Staten and Island Enterprises' claim.

3

> For land purchased under a grant for airport development purposes (other than noise compatibility), it will, when the land is no longer needed for airport purposes, dispose of such land at fair market value or make available to the Secretary an amount equal to the United States' proportionate share of the fair market value of the land. That portion of the proceeds of such disposition which is proportionate to the United States' share of the cost of acquisition of such land will, (a) upon application to the Secretary, be reinvested in another eligible airport improvement project or projects approved by the Secretary at that airport or within the national airport system, or (b) be paid to the Secretary for deposit in the Trust Fund if no eligible project exists.

Id., Ex. B, at 24; Id., Ex. C, at 25. The grant agreements contained assurances by the sponsors that they would not:

> take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in the grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor.

Id., Ex. B, at 17; Id., Ex. C, at 21.

MIDA leased airport property purchased with federal grant funds to Staten and Barbara Staten. The lease was executed on September 6, 1999, and was intended to run for 31 years. In 2004, Staten and Island Enterprises filed a lawsuit against MIDA and other defendants, alleging violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 et seq., civil rights claims, and other claims related to the management of the Airport.[5] Staten and Island Enterprises settled with MIDA in March 2005, and the parties filed a joint motion for the court to enter judgment against MIDA. As part of the settlement, the parties agreed that the judgment could be enforced only against Airport property. MIDA also agreed to convey ownership of its real

---

[5]     The case was styled as Staten v. Delaware County, Case No. 04-cv-0504-TCK-SAJ (N.D. Okla.), and is still pending against other defendants. Staten and Island Enterprises alleged that MIDA and other defendants conspired to falsely accuse Staten of misappropriating grant funds.

property to Island Enterprises.  The settlement did not refer to MIDA's grant agreements with the FAA and MIDA did not request consent from the FAA to transfer ownership of the property.  On May 18, 2005, Island Enterprises filed a deed in the Delaware County Clerk's office identifying it as the owner of the subject real property.

However, this was not the only judgment against MIDA.  In Mid-America AG Network, Inc. v. Monkey Island Development Authority, Case No. 02-CV-105-CVE-PJC (N.D. Okla.), Mid-America AG Network, Inc. (Mid-America) sued MIDA for declaratory and injunctive relief, alleging that MIDA improperly terminated a lease for non-payment of rent.  After a bench trial, the Court ruled that the lease was enforceable and Mid-America was in compliance with the lease.  MIDA appealed the verdict to the Tenth Circuit and this Court's decision was affirmed.  Following the appeal, the trial court awarded Mid-America $85,878 for attorneys' fees.  Mid-America obtained an order of sale and sought to enforce its judgment for attorneys' fees against property owned by MIDA.  A federal marshal executed the order for sale, and scheduled a sale of all property owned by MIDA, including real property, for May 19, 2005.

The FAA and the Oklahoma Aeronautics Commission objected to the sale and sought leave to intervene for the purpose of vacating the order of sale.  The FAA challenged the proposed sale on the ground  that federal law prevented a state law judgment creditor from executing against property acquired with a federal grant.  After a hearing, Magistrate Judge Paul Cleary vacated the order of sale because MIDA transferred the property to Island Enterprises before the sale could take place.[6]  The magistrate judge found that the order of sale was facially deficient, and before the sale

---

[6]     Island Enterprises and Staten have appealed the magistrate judge's order.  The Court's review of Staten's appeal is intertwined with the Court's ruling on the pending motions in this case, and the Court will rule on the appeal following its decision on these motions.

could proceed, Mid-America needed to obtain a new order that correctly identified the owner of the property. He reserved any ruling on the legal arguments presented by the parties. Staten and Island Enterprises appealed the magistrate judge's order.

## II.

Defendants Staten and Island Enterprises have filed a motion to dismiss the FAA's claims on the ground the federal government has exceeded its authority under the Spending Clause of the United States Constitution.[7] Defendants argue that the federal government is attempting to trample the rights of state law judgment creditors in violation of the powers reserved to the states under the Tenth Amendment. The FAA responds that the federal government has the authority under the Necessary and Proper Clause[8] to enforce the Spending Clause by preventing MIDA or any other defendant from disposing of property purchased with federal grant funds.

## A.

Defendants have styled their motion as a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) or 12(b)(6). However, defendants are not challenging the authority of the Court to hear plaintiff's claims, but instead, defendants take issue with the

---

[7]   Defendants also claim that the FAA lacks standing to sue defendants, because the FAA has no legal or equitable interest in the proceeds of the marshal's sale of MIDA property. Defendants direct the Court to their briefing in the appeal of the magistrate judge's order vacating the order of sale in Case No. 02-CV-0105-CVE-PJC.

[8]   Plaintiff appears to suggest that the Necessary and Proper Clause is an independent basis for the federal government to regulate the use of grant funds. Defendants are correct that this would be an inaccurate statement of law, but plaintiff's response cites case law that clarifies that the Necessary and Proper Clause may be used only to carry out the federal government's enumerated powers.

government's authority to interfere with the sale of Airport property.[9] Therefore, the Court will treat defendants' motion as a Rule 12(b)(6) motion seeking dismissal against plaintiff for failure to state a claim upon which relief may be granted. When reviewing a motion to dismiss under Rule 12(b)(6), the court must construe the allegations of the complaint as true and view the allegations in the light most favorable to the nonmoving party. Moffett v. Halliburton Energy Services, Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). A Rule 12(b)(6) motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Sutton v. Utah State School for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).

## B.

Defendants' primary argument is that the Tenth Amendment of the United States Constitution reserves certain powers to the states, such as the power to regulate the sale of property following attachment by a judgment creditor. Defendants claim that allowing the FAA to interfere with the proposed sale would effectively prevent any judgment creditor from enforcing a judgment against MIDA and invalidate the judgment held by defendants.[10] Plaintiff responds that, under the

---

[9]     Even if the Court treated this motion as a motion to dismiss for lack of subject matter jurisdiction, the standard of review would be the same. The merits of plaintiff's claims are intertwined with the jurisdictional issues, and the Court would be required to convert defendants' motion into a 12(b)(6) motion. Sizova v. Nat'l Institute of Standards & Technology, 282 F.3d 1320, 1324 (10th Cir. 2002); United States ex rel. King v. Hillcrest Health Center, Inc., 264 F.3d 1271, 1278 (10th Cir. 2001).

[10]    In a separate case, Mid-America AG Network v. Monkey Island Development Authority, Case No. 02-CV-105-CVE-PJC (N.D. Okla.), defendants objected to the magistrate judge's order allowing the FAA to intervene in the post-judgment proceedings. Defendants request the Court to incorporate their arguments on the FAA's standing in their objection into the motion to dismiss; however, the Court finds the issues distinguishable and will review the objection to the magistrate judge's ruling in a separate order.

broad authority granted to the federal government under the Spending Clause, the FAA has the authority to enforce grant provisions against third party judgment creditors to protect federal property.[11]  It is not clear from defendants' motion to dismiss that they have standing to raise the Spending Clause as a defense, because their rights as state law judgment creditors are not directly being harmed by plaintiff's actions.  However, assuming that defendants have standing to raise this issue, the Court finds the FAA is acting within its authority under the Spending Clause to regulate the use of federal grant funds.

The Constitution grants the federal government the "Power to lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ."  U.S. Const. art. I, § 8, cl. 1.  The Spending Clause grants the federal government broad authority to spend for the general welfare and condition the receipt of federal funds on compliance with federal law.  Oklahoma v. United States Civil Serive Comm'n, 330 U.S. 127 (1947); Helvering v. Davis, 301 U.S. 619, 908 (1937).  Congress may take any action necessary and proper to enforce the Spending Clause with few limitations.  Fullilove v. Klutznick, 448 U.S. 448, 475 (1980); The Legal Tender Cases, 110 U.S. 421 449-50 (1884); M'Culloch v. Maryland, 17 U.S. 316 (1819).  The Tenth Circuit has found four general restrictions on congressional power under the Spending Clause:

> First, Congress's object must be in pursuit of "the general welfare."  In considering whether an expenditure falls into this category, courts should defer substantially to the judgment of Congress.  Second, if Congress desires to place conditions on the

---

[11]    Defendants suggest that the Spending Clause and the Tenth Amendment impose separate limitations on the FAA's authority in this case.  The Tenth Circuit has held that the Spending Clause and the Tenth Amendment are "essentially mirror images" in such situations, stating that, "if the authority to act has been delegated by the Constitution to Congress, then it may act pursuant to Article I; if not, the power has been reserved to the states by the Tenth Amendment."  Kansas v. United States, 214 F.3d. 1196, 1199 (10th Cir. 2000).

state's receipt of federal funds, it must do so unambiguously so that states know the consequences of their decision to participate.  Third, the conditions must be related to the federal interest in the particular program.  The required degree of this relationship is one of reasonableness or minimum rationality.  Fourth, there can be no independent constitutional bar to the conditions.  The Tenth Amendment itself does not act as a constitutional bar; rather, the fourth restriction stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional.

Kansas, 214 F.3d at 1199.  Congress exceeds its Spending Clause powers only when "the choice is clearly wrong, a display of arbitrary power, [or] not an exercise of judgment."  Glenpool Utility Serv. Authority v. Creek County Rural Water Dist. No. 2, 861 F.2d 1211, 1215 (10th Cir. 1988) (quoting Helvering v. Davis, 301 U.S. 619, 640 (1937)).

The Supreme Court has held that the Tenth Amendment places certain limits on congressional power to legislate under the Spending Clause.  In New York v. United States, 505 U.S. 144 (1992), New York challenged congressional authority to enact the Low-Level Radioactive Waste Policy Act, 42 U.S.C. § 2021b et seq., which required states to create a system for disposing of low level radioactive waste.  505 U.S. at 150-51.  Congress included financial incentives to encourage states to comply with the law; however, if states failed to dispose of low level radioactive waste in accordance with federal guidelines they would assume title and liability for damages caused by radioactive waste.  Id. at 151.  The Supreme Court discussed two common situations where the Spending Clause allows Congress to condition acceptance of federal funds on compliance with a federal program:

First, under Congress' spending power, "Congress may attach conditions on the receipt of federal funds."  Such conditions must (among other requirements) bear some relationship to the purpose of the federal spending, otherwise, of course, the spending power could render academic the Constitution's other grants and limits of federal authority.  Where the recipient of federal funds is a State, as is not unusual today, the conditions attached to the funds by Congress may influence a State's legislative choices. . . .

> Second, where Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating the activity according to federal standards or having state law pre-empted by federal regulation.  This arrangement, which has been termed a "program of cooperative federalism," is replicated in numerous federal statutory schemes.

Id. at 167 (citations omitted).  The Supreme Court rejected the federal government's argument that the "take title" provisions of the law were constitutional, because the state was presented with an illusory choice.  Id. at 176 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all.").  The law compelled states to accept federal funds and enact an acceptable waste disposal program, or accept financial liability for failing to comply with federal law.  Although Congress may provide incentives for states to legislate in a particular way, it may not commandeer state legislatures to adopt a federal program.

It is also unconstitutional for Congress to pass a law requiring state officials to execute a federal program.  Printz v. United States, 521 U.S. 898 (1997) (federal program requiring state law enforcement officials to perform background checks of prospective handgun purchasers violated Tenth Amendment).  However, Congress may enact a law preventing states from disclosing personal information contained in state department of motor vehicle records, because the Tenth Amendment does not prevent Congress from prohibiting states from engaging in conduct that falls within Congress' power to regulate interstate commerce.  Reno v. Condon, 528 U.S. 141 (2000) (distinguishing Congressional prohibitions on state conduct from federal legislation that commandeers state legislative or administrative processes).  Congress also has authority to require that federal funds appropriated to state and local governments are spent as Congress intended.  Sabri v. United States,  541 U.S. 600 (2004) ("Congress has authority under the Spending Clause to appropriate federal monies to promote the general welfare, Art. I, § 8, cl. 1, and it has corresponding

10

authority under the Necessary and Proper Clause, Art. I, § 8, cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars.").

Defendants Staten and Island Enterprises argue that it would exceed congressional authority under the Spending Clause to restrict judgment creditors from attaching property purchased with federal funds. Defendants claim that the FAA may enforce grant provisions only against parties to the grant agreement, citing 49 U.S.C. § 47111(f):

> For any violation of this chapter or any grant assurance made under this chapter, the Secretary may apply to the district court of the United States for any district in which the violation occurred for enforcement. Such court shall have jurisdiction to enforce obedience thereto by a writ of injunction or other process, mandatory or otherwise, restraining any person from further violation.

Defendants interpret this provision as a limit on the government's power to monitor use of federal grant money, arguing that the FAA may not seek to enjoin any party that has not actually violated a federal grant. However, defendants' interpretation of section 47111(f) would strip the FAA of its legitimate authority to ensure that federal funds provided to local airport authorities are properly spent. The federal government clearly has the authority to appropriate federal funds under the Spending Clause and also to enforce compliance with federal grant agreements under the Necessary and Proper Clause. See Sabri, 541 U.S. at 605 (criminal statute that allowed federal government to prosecute bribery charges for improper use of state and federal funds necessary and proper method to oversee use of federal funding). Property purchased with federal grant funds is treated as federal property. Neukirchen v. Wood County Head Start Inc., 53 F.3d 809, 811 (7th Cir. 1995). It is a

11

well-established principle of law that federal funds, even in the hands of another party, are not subject to attachment by a judgment creditor.  <u>Buchanan v. Alexander</u>, 45 U.S. 20 (1846).

Considering the enforcement provision of the FAA's grant program under the requirements of <u>Kansas</u>, the Court finds that the FAA has not exceeded its constitutional authority under the Spending Clause.  Grants for airport improvement projects fall within congressional authority to spend for the general welfare.  Defendants are correct that the federal government must notify the state of any conditions attached to receipt of federal funds, but the FAA clearly notified MIDA of any conditions in the grant agreements.  <u>See</u> <u>Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy</u>, 126 U.S. 2455, 2459 (2006); <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 181-82 (2005).  The conditions ensure that federal funds will be spent for airport purposes, and are related to the federal interest in providing airport improvement grants. The grant agreements, which directly quote 49 U.S.C. § 47107, specifically provide the FAA a right to claim its proportionate share of funds from any sale of Airport property if the property is no longer used for airport purposes.  <u>See</u> 49 U.S.C. 47107(c)(2)(B)("the owner of operator, when the land is no longer needed for an airport purpose, will dispose of the land at fair market value or make available to the Secretary an amount equal to the Government's proportional share of the fair market value").  Contrary to defendants' assertions, the Tenth Amendment does not impose a limitation on a spending program unless the state has been compelled to enact a federal program.  <u>See</u> <u>New York</u>, 505 U.S. at 166 ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

Defendants were aware at the time they entered a contract with MIDA that federal oversight and intervention was a legitimate possibility.  Although the FAA's intervention makes it more difficult for defendants to collect a judgment against MIDA, the FAA is clearly within its constitutional authority to protect federal property from judgment creditors.

## C.

Defendants also argue that the FAA is limited to contract remedies, specifically monetary damages, in Spending Clause litigation.  According to defendants, the FAA may recover grant funds from MIDA, but it may not prevent judgment creditors from selling MIDA property.  This argument misinterprets the applicable law, and the FAA has authority under 49 U.S.C. § 47101 et seq. to seek equitable relief to protect federal interests in airport property purchased with a federal grant.

Citing Barnes v. Gorman, 536 U.S. 181 (2002), defendants claim that the federal government may enforce grant provisions only by seeking a judgment for monetary damages, because the Spending Clause precludes equitable remedies.  However, the Supreme Court has held that the federal government may seek contract remedies in addition to any other remedies provided by statute.  Id. at 187; Franklin v. Gwinnett County Public Sch., 503 U.S. 60 (1992).  If the state chooses to receive federal funds, the Supreme Court has clearly established that "administrative oversight and termination of federal funding in the event of a State's failure to perform its statutory duties is not the sole remedy in Spending Clause cases."  Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981).  The FAA has authority to claim airport property and sell that property in the event MIDA breached the grant agreement.  49 U.S.C. § 47107.  The FAA has been given legislative authority to protect federal grant funds and property interests, which provides a basis for the FAA to seek equitable relief in this case.  The FAA could ask the Court for monetary

13

damages, but federal legislation provides the FAA a variety of remedies to choose from when monitoring the use of federal funding. Therefore, the Court will not limit the FAA to contract remedies only, because the FAA has been given statutory authority, in addition to its power under the Spending Clause, to seek equitable relief. The Rule 12(b)(6) motion to dismiss is denied.

### III.

Plaintiff has filed a motion for summary judgment (Dkt. # 41) against the County and MIDA. MIDA has not responded and the material facts stated in plaintiffs motion are deemed confessed as to MIDA. See Fed. R. Civ. P. 56(e) ("If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."); LCvR 7.2 ("If a dispositive motion is not opposed, the Court may in its discretion either (1) provide an additional eleven days, after which the case will be dismissed, or the motion will be deemed confessed, as appropriate, or, (2) in the event the moving party has filed a motion for confession of judgment, such motion may be granted following eleven days after filing."). However, "a party's failure to file a response to a summary judgment motion is not, by itself, a sufficient basis on which to enter judgment against the party. The district court must make an additional determination that judgment for the moving party is 'appropriate' under Rule 56." Reed v. Bennett, 312 F.3d 1190, 1995 (10th Cir. 2002). Plaintiff argues that both defendants agreed to be bound by the grant agreements and MIDA violated the grant agreements by encumbering airport property without permission from the FAA. The County claims it was never a sponsor under the grant agreements and can not be held liable for violations of the grant agreements. It also claims that the Oklahoma Constitution prohibits the Court from entering a judgment against the County.

14

**A.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Durham v. Xerox Corp., 18 F.3d 836, 838-39 (10th Cir. 1994)

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or

15

whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## B.

The County does not argue that MIDA did not violate the grant agreements.  Neither defendant has disputed that MIDA agreed not to "sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests" in airport property.  Dkt. # 41, Ex. B., Grant Agreement at 17; Ex. C, Grant Agreement at 21.  The County does not dispute that MIDA leased the property to Staten and Island Enterprises without approval from the FAA, nor does the County contest plaintiff's allegations that MIDA conveyed title to Staten and Island Enterprises as a part of a settlement agreement.  The undisputed material facts establish that MIDA breached its contract with the FAA by leasing and eventually conveying the property to Staten and Island Enterprises without consent from the FAA.  Therefore, the Court finds that liability against MIDA is conclusively established for breach of the grant agreement.[12]

The remaining issue  is whether the County can be held liable for MIDA's breach of the grant agreement.  The federal government can sue any grant recipient for violations of a grant agreement and seek repayment of misspent funds.  Guardians Ass'n v. Civil Service Comm'n of City of New York, 463 U.S. 582, 602 n.24 (1983).  The FAA argues the MIDA and the County were co-sponsors of the grants, and are both equally liable for repayment.  The County argues that it does

---

[12]     Although the FAA makes a request for damages in a footnote, this issue was not briefed in plaintiffs' motion for summary judgment.  The statutory scheme envisions a range of possible remedies and the Court finds it can not enter a ruling on damages based on the summary judgment briefing.  This Opinion and Order relates only to liability of MIDA and the County.

not meet the definition of a sponsor provided by the grant agreements, because it had no control or ownership over airport property.  After reviewing the summary judgment record, it is clear that the County's position is meritless and it clearly understood when it signed the grant agreements it would be liable for violations of the grant agreements.

The 1994 and 2002 grant agreements were authorized by Board resolutions, because the FAA would not issue the grants unless the County agreed to sign the grant agreements as a sponsor. The FAA routinely follows this procedure, which the Tenth Circuit has upheld as a legitimate exercise of the FAA's constitutional and statutory powers.  Walker Field, Colorado, Public Airport Authority v. Adams, 606 F.2d 290 (10th Cir. 1979) (federal government could require county and city council to sign as co-sponsors for grant without violating Spending Clause or Tenth Amendment because local government could have avoided restrictions by declining grant).  By signing the grant agreements, the County secured funding for the Airport, and contrary to the County's assertions, it received a tangible benefit by acting as a co-sponsor.  The County agreed to abide by the assurances in the grants:

> The County has determined (i) to approve, adopt and agree to abide by and perform all of the Part V Assurances together with any and all requirements under the Grant Agreement, and (ii) that its execution of the Grant Agreement should be and is hereby approved . . . and provided further, that in complying with and/or insuring compliance with the Part V Assurances and all other requirements under the Grant Agreement, the County shall have the option of delegating the performance of requirements under the Grant Agreement to the Authority or such other duly authorized entity as may be properly designated by the County, notwithstanding the County being ultimately responsible for complying with the Part V Assurances and all other requirements under the Grant Agreement . . .

Dkt. # 47, Ex. 1, Resolution, at 1; see also Dkt. # 41, Ex. C, Grant Agreement at 29.  The County delegated certain functions to MIDA, but retained ultimate authority for management of the Airport. The County signed the grant agreements as a sponsor, agreeing to

17

> ratify and adopt all assurances, statements, representations, warranties, covenants, and agreements contained in the Project Application and incorporated materials referred to in the foregoing Offer and does hereby accept this Offer and by such acceptance agrees to comply with all of the terms and conditions in this Offer and in the Project Application.

Dkt. # 41, Ex. B, Grant Agreement at 4; Ex. C, Grant Agreement at 6.  The grant agreements were also signed by the County's attorney, who found that the County had authority to enter the contract and that the contract constituted a binding obligation against the County in its capacity as a sponsor of the grant.  By signing the grant agreement, the County's attorney declared:

> I have examined the foregoing Grant Agreement and the actions taken by said Sponsor relating thereto, and find that the acceptance thereof by said Sponsor and Sponsor's official representative has been duly authorized and that the execution thereof is in all respects due and proper and in accordance with the laws of the said State and the Act.  In addition, for grants involving projects to be carried out on property not owned by the Sponsor, there are no legal impediments that will prevent full performance by the Sponsor.  Further, it is my opinion that the said Grant Agreement constitutes a legal and binding obligation of the Sponsor in accordance with the terms thereof.

Id., Ex. B at 4; Ex. C at 6.  This affirms the County's duty to assume responsibility for use of grant funds, even if the County does not own Airport property, and states that the County had legal authority to sign the grant agreements.

The County's arguments that it did not intend to exercise control over the Airport or to be bound as a sponsor of the grant agreements are not supported by the record.  The County directs the Court to a definition of "public agency sponsor" in the grant agreements, claiming the County does not meet this definition.  The agreement describes a public agency sponsor as "a public agency with control of a public-use airport."  According to the 1994 Board resolution, the County agreed to exercise ultimate control over the Airport, even though it could delegate authority to MIDA for

18

managing day-to-day operations.[13]  Even if the Court were to accept the County's argument that it

does not meet the definition of sponsor, the Board resolutions provide conclusive evidence that the

County intended to abide by the assurances in the grant agreements.[14]  The FAA had authority to

condition the grants upon the County's acceptance of the grant agreements as a cosponsor.  <u>Walker</u>,

606 F.2d at 297-98; <u>Town of Fairview v. United States Dept. of Transp.</u>, 201 F. Supp. 2d 64, 66 n.1

(D.D.C. 2001); <u>In re Air Crash at Detroit Metropolitan Airport, Michigan on August 16, 1987</u>, 791

F. Supp. 1204, 1219 (E.D. Mich. 1992).  If the County did not want to be bound by the grant

agreements, it could have refused to accept federal funding.  However, once the County agreed to

act as a sponsor at the request of the FAA, it was responsible for any violations of the grant

agreements.

The County argues that as a beneficiary of a public trust, it may not be exposed to liability

for the trust's actions.  Oklahoma law clearly establishes that a public trust is a separate entity from

its beneficiary, and the FAA does not dispute this contention.  <u>See</u> Okla. Stat. tit. 60, § 176.1 (stating

that a trust "[e]xist[s] as a legal entity separate and distinct from the settlor and from the

governmental entity that is its beneficiary").  Defendants cite Okla. Stat. tit. 60, § 179, which states:

> No trustee or beneficiary shall be charged personally with any liability whatsoever
> by reason of any act or omission committed or suffered in the performance of such
> trust or in the operation of the trust property; but any act, liability for any omission
> or obligation of a trustee or trustees, in the execution of such trust, or in the operation

---

[13]    The County's arguments that it did not hold title to Airport property and limited its
involvement to zoning issues are irrelevant, because these are self-imposed restrictions by
the County which do not limit its legal obligations under the grant agreements.

[14]    The County failed to attach any evidence to its response.  There is no evidence before the
Court which would allow it to infer that the FAA intended to allow the County to act as a
limited sponsor to the grant agreements or that the FAA removed any restrictions or powers
from the County.

of the trust property, shall extend to the whole of the trust estate, or so much thereof
as may be necessary to discharge such liability or obligation, and not otherwise.

However, the FAA is not seeking to impose liability on the County simply because it is MIDA's

beneficiary.  The FAA points to an independent basis for its claims against the County, the grant

agreements, and consequently, the County is being held liable for its own actions.  The grant

agreements impose direct liability, not vicarious liability, for violations of the grant agreements.  See

McKosky v. Town of Talihina, 581 P.2d 482 (1977) (municipal entity can not escape liability for

its actions under section 179 by delegating authority for a proprietary function to a public trust).

Section 179 is not applicable and does not shield the County from liability in this case.

### C.

The County argues that it did not have authority to sign the grant agreements as a sponsor

under the Oklahoma Constitution, and the FAA should have been aware that the County did not have

capacity to accept the grants.  Article 10, Section 26 of the Oklahoma Constitution provides:

> Except as herein otherwise provided, no county, city, town, township, school district,
> or other political corporation, or subdivision of the state, shall be allowed to become
> indebted, in any manner, or for any purpose, to an amount exceeding, in any year,
> the income and revenue provided for such year without the assent of three-fifths of
> the voters thereof, voting at an election, to be held for that purpose, nor in cases
> requiring such assent, shall any indebtedness, in the aggregate exceeding five percent
> (5%) of the valuation of the taxable property therein, to be ascertained from the last
> assessment for state and county purposes previous to the incurring of such
> indebtedness . . .

This provision is inapplicable, because the grants from the FAA are not debts within the meaning

of this section.  "A promise to pay a certain amount, with interest, within a fixed time, out of taxes

taken from all the people, including those not benefitted" would generally be classified as a debt

under this section.  Willow Wind, Inc. v. City of Midwest City, 790 P.2d 1067, 1070 (Okla. 1989)

(quoting City of Lawton v. Morford, 293 P. 1068, 1071 (Okla. 1930)).  A county or municipal

government may not agree to pay an amount exceeding what is currently available in the general revenue without authorization from the electorate.  Hood v. Jones, 50 P.2d 1124 (Okla. 1935).  The FAA grants are not loans, nor did the FAA require the County to pay funds out of its general revenue for a county project.  If the County is held liable for violations of the grant agreements, it will simply be returning funds that would not have been part of its general revenue without grants from the federal government.  The grants accepted by the County and MIDA are not debts under Art. 10, § 26 of the Oklahoma Constitution, and this section does not provide a basis to void the grant agreements.

The County also cites United States v. Yazell, 382 U.S. 341 (1966), which held that state interests in the area of domestic relations law precluded the federal government from collecting a small business loan from a debtor.  The County argues that the Oklahoma Constitution's prohibition on incurring municipal debt should override the FAA's interest in collecting misappropriated grant funds, because local interests outweigh those of the federal government.  Yazell has been confined to the state's overriding interest in domestic relations law, and does not apply in any other context. Director of Revenue, State of Colorado v. United States, 392 F.2d 307, 313 (10th Cir. 1968).  The general rule is that the  "obligations to and rights of the United States under its contracts are governed exclusively by federal law."  Rio Grande Silvery Minnow v. Keys, 333 F.3d 1109, 1129 (10th Cir. 2003); United States v. Las Cruces, 289 F.3d 1170, 1186 (10th Cir. 2002).  The federal government's rights and obligations under its contracts are determined by reference to federal law. The authorization for the grants was clearly tied to the federal government's authority to provide airport improvement grants, and the Supremacy Clause dictates that federal law prevails when state

21

law conflicts with federal law in such cases.  <u>King v. United States</u>, 301 F.3d 1270, 1276-77 (10th Cir. 2002).

The Oklahoma Constitution does not provide a bar to enforcement of the grant assurances against the County.  Therefore, the County will be held jointly liable with MIDA for repayment of federal grant funds for violations of the grant agreements.  Plaintiff is entitled to summary judgment against the County and MIDA on the issue of liability.

**IT IS THEREFORE ORDERED** that Motion to Dismiss by Defendants Paul Staten and Island Enterprises and Memorandum of Points and Authorities in Support Thereof (Dkt. # 20) is **denied**; Plaintiff Mineta's Motion for Summary Judgment against Defendant Board of County Commissioners of the County of Delaware and Defendant Monkey Island Development Authority (Dkt. # 41) is **granted**.

**DATED** this 19th day of September, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT